Mary Ann HENDRICK, Appellant,

v.

Roy Glenn VOSS et ux., Appellees.

No. 15582.

Court of Civil Appeals of Texas.

Dallas.

March 25, 1960.

Daugherty, Bruner & Kelsoe, Dallas, and Moses & Truett, McKinney, for appellant.

Matthews, Aultman & Riley, Fort Worth, for appellees.

DIXON, Chief Justice.

Appellant Mary Ann Hendrick instituted habeas corpus proceedings to recover custody of her child from appellees Roy Glenn Voss and wife Lareda Ruby Voss. Appellees filed an answer and a cross-action alleging the infant child had been abandoned by appellant, and praying that it be declared a dependent and neglected child.

After a trial before the court without a jury judgment was rendered September 2, 1958, declaring the child to have been dependent and neglected since August 1, 1957; finding appellant not to be a fit and proper person to have custody; finding appellees to be fit and proper persons to have care and custody; and remanding the child to the custody of appellees.

*Facts:*

The nature of appellant's points on appeal requires that we present a rather full statement of the evidence adduced at the trial, especially the testimony of appellant.

The child, a boy, was born March 29, 1957, in Collin County, Texas. Appellant testified that she had supposed she was

married to a man she knew as Staff Sergeant Howard Goins, stationed at Sheppard Air Force Base at Wichita Falls, Texas. She had gone from McKinney, Texas, to Wichita Falls for the wedding. She afterwards learned that the person who performed the ceremony was not really a minister of the gospel, and that the purported marriage license was not genuine. She has not seen Goins since July 1956.

Appellant, 25 years of age at the time of the trial, had been twice married and divorced before she went through the false ceremony with Goins. Her first marriage, at the age of 16 or 17, lasted only three months. By her second husband, Gilbert Nix, of McKinney, Texas, she had one child, who was about six years old at the time of the trial. She was divorced from Nix in April 1956. There has been continued strife between appellant and Nix concerning the care and custody of their son. Appellant is now married to her fourth husband, Harold Hendrick.

Following the birth on March 29, 1957, at a McKinney Hospital of the baby who is the subject of this litigation, appellant returned to the home of her parents, who live about seven miles from McKinney. In June or July 1957 she moved to the Crawford Apartments in McKinney. The landlady at the apartment took care of the baby while appellant worked during the day at a beauty shop in Farmers Branch, Texas. Soon thereafter appellant moved to Dallas, where she lived in various places, changing her address frequently. Among other places in Dallas where appellant lived was a house on Denton Drive across the street from the North Temple Baptist Church, of which Dr. C. E. Colton was pastor.

Appellant did not know Dr. Colton, but sometime in July she went to see him for consultation and advice about the baby. She was worried because the baby was not receiving proper care and attention at the Crawford Apartments. For one thing he was broken out with a heat rash. Further, she herself was not in a position to assume full responsibility for his care and custody.

Appellant and Dr. Colton discussed her situation and agreed that the baby should be placed in the care and custody of suitable persons for adoption. Accordingly a few days later appellant brought the baby to the church and surrendered possession of him to Dr. and Mrs. Colton. The child was then turned over to appellees, who took him with the intention of adopting him after the lapse of six months.

At the time appellant gave up the baby she knew that she was permanently surrendering his care and custody to others. She did not know who was going to take permanent care and custody of him. But whoever they might be, she said that she would not bother them.

A few days after appellant surrendered possession of the baby to the Coltons, Ralph Churchill prepared a document for appellant to sign. Appellant refers to this document as a release. On August 1, 1957, appellant signed the instrument under the terms of which she surrendered physical possession of the baby to appellees and consented for them to adopt him without further notice to her. The names of appellees were written in after appellant had signed and acknowledged the document before a notary public.

On October 7, 1957, appellant married Harold Hendrick, her present husband. At first they lived in his home in Dallas. But appellant's six year old son was unhappy, so they moved to the property owned by appellant's parents and her sister about seven miles from McKinney.

At the time of the trial, Harold Hendrick, appellant's present husband, was employed in Dallas at the Superior Bowling Lanes. He traveled back and forth daily between Dallas and their home near McKinney. Appellant meantime has been employed from time to time in various beauty shops. At one time she worked part time as a waitress in the Pilot Lounge after

finishing her day's work at a beauty shop. At the time of the trial appellant was working in a beauty shop in McKinney.

Appellant, her husband and her son now live in a small house on the tract of land where her parents live. Pictures of it were introduced into evidence. It is a small neatly furnished cottage of open construction, with planter boxes dividing the sleeping, living, cooking and dining areas.

There is another and larger house on another part of the tract about 50 feet from appellant's house. The parents operate a rest home for aged persons in the larger house. While appellant and her husband are away during the day, the six year old boy is cared for by appellant's parents and a colored girl employed by appellant.

In October 1957 soon after she married Hendrick, appellant and her former husband Nix, father of her six year old boy, had a difficulty concerning the boy, during which difficulty she shot and wounded Nix. About two hours before the shooting she had bought a pistol from a police officer. Appellant says that Nix shot at her six times. However, appellant was arrested and taken to jail immediately after the shooting. She was charged with assault to murder. Later, after the charge was reduced to aggravated assault, she pled guilty and paid a fine.

On the day before the trial of the present case, appellant and Nix became involved in a heated argument again about their boy. Appellant testified that she couldn't stand the torment and torture Nix was putting her through. In this connection we quote from her testimony:

"Q. All right. Now, did you make any other threats to him about killing him? A. I have never threatened to kill him. No, sir, I have never threatended to kill him.

"Q. Do you feel that you have sufficient control now, that you won't again do what you were charged with doing before, that is, shooting at him or something? A. I think Mr. Nix had his warning, I think he will leave me alone, I feel in no danger from him any more. He should have learned his lesson.

"Q. All right. And if he doesn't, did you have in mind doing the same thing again? A. I don't have in mind of bothering him in any way, I just want him to leave me alone, and I am sure he will."

Once when a youngster appellant was summoned to jail about a matter, but no charge was filed. On another occasion appellant and her cousin were arrested in Austin, Texas. They had become involved with a carnival man and his mother. Appellant's mother and father had filed a complaint against the carnival people. Appellant did not remember the details of this episode, or why she and her cousin were picked up by the Austin Police.

In November 1957 appellant had her attorney write a letter withdrawing and cancelling her release of the baby and her consent for its adoption.

Thereafter she filed a habeas corpus proceeding against Ralph Churchill, who did not have possession of the baby, but at a hearing was required to disclose the names of the appellees who did have possession. The present habeas corpus proceeding was then filed against appellees.

After appellant had finished her testimony, Ralph Churchill, an attorney at law, was called as an adverse witness.

There was no real conflict between the testimony of appellant and Churchill. The attorney testified that before appellant signed the release and consent for adoption, he fully explained the document and its legal significance to her. On this point appellant testified she did not remember what he said, but she does not deny Churchill's statement. We quote from her testimony:

"Q. Now, Mrs. Hendrick, isn't it a fact that Mr. Churchill very carefully

and voluntarily explained to you the instruments that you signed? A. I will say that if he says he did, I say he did, too, I do not remember what we discussed. I remember signing the, things, and other than that, that is it. * * *

"Q. He didn't use any persuasion or any power over you, did he, Mrs. Hendrick? A. No, sir, he did not.

"Q. And he treated you very courteously, did he not? A. I suppose he did.

"Q. And did he explain very carefully to you everything that he had there, did he not? A. If he said he did, he did. * * *

"Q. Did you know Mr. Churchill was coming out there to see you when he came? A. I don't know, I believe that he called.

"Q. And didn't he tell you that he was bringing some papers for you to sign? A. I believe so.

"Q. So you knew that he was coming and you were to sign some papers, did you not? A. Yes.

"Q. And you knew that those papers were related to the question of your child and its custody being placed with other people? A. Yes, sir.

"Q. Now, Mr. Churchill explained carefully to you that it was a permanent situation, did he not? A. I suppose he did, as I told you sir, I do not remember it—any of the conversation."

After Churchill finished his testimony appellant rested her case. Then three witnesses, including Rev. Colton, testified in behalf of appellees. They stated that appellees were fit and proper persons to have the care and custody of the baby; and that in their opinion the home atmosphere of appellant and her husband was not suitable for that purpose. Otherwise their testimony and that of appellant was not in material conflict. Appellant had fully cross-examined appellees' witnesses. Following the testimony of Rev. Colton the court made the challenged remark which is hereinafter quoted, and no more testimony was offered by either side.

Included in the record without objection from any of the parties is an investigator's report prepared by a Dallas County juvenile officer. This report is lengthy, occupying fifteen pages in the transcript, so we shall not attempt even to summarize its contents. There are no material factual statements in it seriously contradictory of appellant's testimony. It quotes statements from persons to whom the contesting parties referred the investigator. Appellant's references spoke favorably of her as a fit and proper person to have care and custody of the baby; appellees' references spoke favorably of appellees. The investigator did not make any recommendation as to future care and custody.

*Opinion:*

Appellant's first point on appeal is that the court erred in the trial by stopping the proceeding and announcing "The Court does not care to hear any more", and then proceeding to rule on the case then and there, without giving appellant an opportunity to fully cross-examine all the witnesses that were to be offered by appellees, or without giving her an opportunity to put on any witnesses in rebuttal on the issues of whether the child was dependent and neglected, or had been abandoned by appellant, or that appellant was not a fit and proper person to have care and custody of the child.

Appellees in their reply brief point out that appellant had rested her case and appellees had presented most of their testimony when the trial judge made the remark above quoted; that appellant did not at that time make an objection to the court's statement, or make any request to present further testimony, or advise the court that she had any further testimony to offer; and that consequently appellant, having ac-

quiesced in the court's action and waived any objection she may have had, cannot now be heard to complain because the court proceeded to render judgment for appellees without hearing further testimony from either side.

■ Of course appellant had a right to offer witnesses to testify in rebuttal of the testimony offered by appellees. Lumbermen's Lloyds v. Jones, Tex.Civ.App., 264 S.W.2d 759, reversed on other grounds, 153 Tex. 379, 268 S.W.2d 909; Panhandle Const. Co. v. City of Spearman, Tex.Civ. App., 89 S.W.2d 1053. However it is a right that may be waived by a failure to object, Richker v. Georgandis, Tex.Civ. App., 323 S.W.2d 90; City of Houston v. Huber, Tex.Civ.App., 311 S.W.2d 488, or by a failure to tender the witnesses to the court and make offer of proof. Houston Oil Co. v. Kimball, Tex.Civ.App., 114 S.W. 662; Galveston, H. & S. A. R. Co. v. Dehnisch, Tex.Civ.App., 57 S.W. 64.

■ Appellees say in their brief, and it is not denied by appellant, that an interval of five or seven minutes elapsed from the time the Judge made the quoted remark until he finished writing on the Court's docket sheet, then rendered judgment. The record itself bears out appellees' assertion that neither appellant nor appellees objected to the court's remark, or advised the court that they had other witnesses or additional testimony to offer. The first time appellant complained, so far as the record shows, was when she filed her motion for new trial on September 12, 1958, ten days after the trial. This was too late. Texas Employers' Ins. Ass'n v. Heuer, Tex.Civ. App., 11 S.W.2d 566; Philadelphia Trust Co. v. Johnson, Tex.Civ.App., 257 S.W. 280.

Appellant carried her complaint forward into her amended motion for new trial, filed October 1, 1958. The court held a lengthy hearing on the motion on October 30, 1958, at which time he was informed by appellant's attorney what facts certain persons would have testified to if they had been called as witnesses. With this information

before him the Court overruled appellant's motion for new trial, the order being signed November 12, 1958. So far as the record shows the trial judge was not actually aware of appellant's claim that she had additional witnesses available until he was so informed at the hearing on appellant's motion for new trial.

On December 23, 1958, appellant presented the court with a bill of exceptions in which she states that she had ready and available as witnesses her father, mother, sister and four other persons. Attached to this bill of exceptions were affidavits of appellant's father, mother, sister and two other persons who stated that they were present in court on September 2, 1958, and if called, would have testified that appellant was a fit and proper person to have the care and custody of the baby.

The trial judge signed the above bill with the qualification that (1) he did not certify that appellant was not given an opportunity for rebuttal, because appellant's testimony had been offered and no objection had been made to the court's ruling, hence objection had been waived; (2) nor did he certify that appellant had been deprived of a full, fair hearing; but (3) he did certify that appellant did not offer the named witnesses at the trial and no objection had been made concerning their failure to testify.

■ Below the court's signature is a memorandum not dated, signed by appellant's attorney, but not by the Judge, stating that appellant objects and excepts to the court's qualification of the bill of exception. This memorandum cannot be accepted as a valid exception to the qualification because it was not signed by the Judge, no bill of exceptions was ever filed supporting it, nor does the record show that the attempted exception was ever brought to the attention of the Judge so that he could prepare his own bill of exceptions as provided by Rule 372(i), Texas Rules of Civil Procedure. Payne v. State, 164 Tex.Cr.R. 306, 298 S.W.2d 151; Tucker v. Slovacek,

Tex.Civ.App., 234 S.W.2d 254 (Syls. 8–12); Porter v. State, 154 Tex.Cr.R. 540, 229 S.W.2d 68; Alamo Iron Works v. Prado, Tex.Civ.App., 220 S.W. 282. Anyway the bill itself as prepared by appellant does not show any objection was made by appellant at the time of the trial, so the matter complained of does not constitute reversible error. Therefore the exception to the court's qualification, even if it had been valid, would not result in a reversal based on the bill of exceptions. Smith v. United Gas Pipe Line Co., 149 Tex. 69, 228 S.W.2d 139 (Syls. 5 & 7).

We have gone into a somewhat lengthy discussion of the evidence and the several procedural steps leading to this appeal because of the nature of appellant's first point as well as others which we shall discuss. But we are mindful of the general rule that technical rules of pleading and practice need not be strictly followed in child custody cases. It is the best interests of the child which are paramount. Therefore we have given careful consideration to the record as a whole.

Considering the record as a whole we cannot agree with appellant that we should reverse the court's judgment on the grounds that the court did not give her an opportunity to offer rebuttal testimony that the child's best interests would be served by awarding its care and custody to her. Since most of the material facts were testified to by appellant herself, it cannot be anticipated that her witnesses would have presented much rebuttal testimony. Furthermore, even if the court did not get to hear some of her witnesses at the trial, he later learned what they would have testified; and in the light of that knowledge adhered to his judgment by overruling appellant's motion for new trial. If we apply the usual rules of procedure, appellant's first point on appeal certainly should be overruled; but even if we do not strictly apply the rules of practice and procedure, we still conclude that appellant's complaint

is without merit in substance. Appellant's first point on appeal is overruled.

In her second point appellant says that the court erred in not sustaining her contention that she had a right as a matter of law to withdraw her consent for the adoption of her child at any time before the expiration of six months.

It is well established that a parent has a right to withdraw consent for adoption of his or her child at any time before the court acts on the petition for adoption. Wilde v. Buchanan, 157 Tex. 606, 305 S.W. 2d 778. However we do not find any ruling to the contrary by the court in this case. The court did find that appellant executed a written consent. That is an undisputed fact. Appellant so testified herself. It is also an undisputed fact that her attorney in her behalf prepared and mailed a letter withdrawing her consent. Anyway the question is immaterial here. This is not a suit for adoption. Appellees have not asked judgment for adoption. Appellees sought and obtained a judgment declaring the child to be dependent and neglected. Appellant's second point is overruled.

In her third, fourth and fifth points appellant asserts that the evidence is insufficient to sustain the court's findings that (1) the child was dependent and neglected; (2) appellant abandoned the child; and (3) appellant is not a fit and proper person to have his care, custody and control.

We are unable to agree with appellant. As we have pointed out the facts as we have narrated them are taken for the most part from the testimony of appellant herself. She voluntarily surrendered possession of her child to others. Though she later had a right to withdraw her consent for its adoption, and did so, the question of the best interests of the child with regard to its care and custody remained a question for the court to decide, though appellant is the mother of the child. Broome v. Edna Gladney Home,

Tex.Civ.App., 295 S.W.2d 266; Herre **v.** Morris, Tex.Civ.App., 251 S.W.2d 260; Austin v. Collins, Tex.Civ.App., 200 S.W. 2d 666; Davis v. Sears, Tex.Com.App., 35 S.W.2d 99; Legate v. Legate, 87 Tex. 248, 28 S.W. 281. This is especially true when, as in this case, others have had the child for some time, and its award to its mother would involve a change in custody. Taylor v. Meek, 154 Tex. 305, 276 S.W.2d 787.

Article 2330, Vernon's Ann.Civ.St., defines a neglected and dependent child as " * * * any child under sixteen years of age * * * who is destitute, homeless or abandoned; or who has not proper parental care or guardianship." The undisputed testimony shows that appellant abandoned the child on August 1, 1957. During the following months the child did not have proper parental care from appellant. We think these authorities support the court's judgment with reference to the matters presented in appellant's third, fourth and fifth points: Legate v. Legate, 87 Tex. 248, 28 S.W. 281; Secrest v. Lewis, Tex.Civ.App., 171 S.W.2d 217; DeWitt v. Brooks, 143 Tex. 122, 182 S.W.2d 687; Frazier v. Cowart, Tex.Civ.App., 191 S.W. 2d 94; Broome v. Edna Gladney Home, Tex.Civ.App., 295 S.W.2d 266. Said points are overruled.

█ The substance of appellant's sixth point is that the court erred in allowing appellees' witness B. O. Baker to testify as to his opinion and conclusions concerning the surroundings and environment of the child. The record shows that the appellant's objections to the testimony were sustained, and the testimony ordered stricken. But appellant on cross-examination asked the same questions and received the same answers. The sixth point is overruled.

█ The substance of appellant's seventh point is that the court erred in allowing appellees' witness, Ralph Churchill, to testify as to his opinion and conclusions that neither he nor Dr. Colton "prevailed, or used any type of persuasion or fraud."

There is no merit in this contention. Appellant testified that she gave up the baby voluntarily and of her own free will. The record contains no evidence which would support a finding of fraud. If the admission of the challenged testimony was error, it was harmless error.

The judgment of the trial court is affirmed.